UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION AT LAFAYETTE

| | | |
|---|---|---|
| RUSI P. TALEYARKHAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:10 CV 39 |
| | ) | |
| PURDUE UNIVERSITY, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION and ORDER

## I.  BACKGROUND [1]

Plaintiff Rusi P. Taleyarkhan claims that, in 2002, he led a team of scientific researchers in the discovery of sonofusion (often referred to as "bubblefusion"), a discovery that was highly significant because it marked the breaking of the fusion barrier for the first time in world history. (DE # 103-1 at 3–4.) The results of plaintiff's experiments, which were conducted at Oak Ridge National Laboratory, were published in the prestigious *Science* magazine that same year. (*Id.*)

In 2003, plaintiff was recruited to work for defendant Purdue University by the then-head of the School of Nuclear Engineering, Lefteri Tsoukalas. In 2005, plaintiff was awarded a grant from the Office of Naval Research ("ONR") to fund attempts at

---

[1] Because this matter is before the court on defendant's motion for summary judgment, the facts recited herein are presented in a light most favorable to plaintiff. *NLFC, Inc. v. Devcom Mid-Am., Inc.,* 45 F.3d 231, 234 (7th Cir. 1995). However, it is worth noting that plaintiff has repeatedly asserted throughout this case that various facts were deemed admitted by Magistrate Judge Andrew P. Rodovich in an order dated February 28, 2013. As this court recently explained (DE # 118), Magistrate Judge Rodovich never made any such finding. Accordingly, the court does not consider any facts as having been established as a result of Magistrate Judge Rodovich's February 28, 2013, order.

replicating the experiments.[2] Also in 2005, several papers were published by Yiban Xu and Adam Butt, other scientists at Purdue, claiming to support plaintiff's previous research. (DE # 103-1 at 28.) The collaboration between plaintiff and Tsoukalas eventually broke down and Tsoukalas began calling plaintiff's sonofusion research into question.

In February of 2006, Tsoukalas convened a fact-finding committee (the "Tsoukalas Inquiry Committee") to look into potential research misconduct on the part of plaintiff. (DE # 103-1 at 29; DE # 97-2 at 5.) Plaintiff argues that Tsoukalas did so without properly informing plaintiff or university authorities as required by university policy. (DE # 103-1 at 7.) The Tsoukalas Inquiry Committee completed a report in February 2006 suggesting improper behavior on the part of plaintiff. (DE # 103-1 at 29; DE # 97-2 at 5.) However, defendant claims that it took no action against plaintiff as a result of the Tsoukalas Inquiry, because the committee was established in violation of university protocol. (DE # 97-2 at 5.) Plaintiff claims that as a result of Tsoukalas's inquiry, he experienced the loss of a lecture course, denial of post-doctoral hires and reappointments, the refusal of defendant to submit proposals to the government, and removal of his information from the university webpage. (DE # 103-1 at 30.)

Tsoukalas also criticized plaintiff's research to the press, which plaintiff claims violated Purdue policy. (DE # 103-1 at 7.) On March 8, 2006, the science magazine

_____

[2] Plaintiff has filed a separate lawsuit against ONR in *Taleyarkhan v. United States,* No. 4:14-CV-48-JTM-APR (N.D. Ind., filed June 9, 2014).

*Nature* published an article about the dissidence between Tsoukalas and plaintiff with regard to sonofusion research. (DE # 97-2 at 5; DE # 103-1 at 7.) In response to the controversy and the *Nature* article, defendant convened an ad hoc committee (the "Ad Hoc Committee"). (DE # 97-2 at 5.) The committee recommended further study of the experimental methods used by plaintiff and a determination of whether faculty engaged in nonprofessional actions. (DE # 97-2 at 6.)

Tsoukalas lost his post as head of the School of Nuclear Engineering in August 2006. (DE # 97-12 at 3.) Plaintiff alleges that this was because Tsoukalas was found to have violated university policies with regard to the initiation of the Tsoukalas Inquiry Committee; however, according to plaintiff, defendant declared that Tsoukalas was voluntarily stepping down, publicly supporting his image and standing in the academic community. (DE # 103-1 at 28.) The Dean of the College of Engineering, Leah Jamieson, named Dr. Vincent Bralts as Tsoukalas's successor. (DE # 97-2 at 3-4.)

In September of 2006, Tsoukalas and another doctor, Dr. Bertodano, made allegations of research misconduct against plaintiff to Dean Jamieson. (DE # 97-2 at 6.) According to plaintiff, these allegations were the brainchild of Purdue's Vice-President of Research, Dr. Rutledge, who invited Tsoukalas and Bertodano to submit the allegations. (DE # 103-1 at 8.) At this time, an inquiry committee (the "2006 Inquiry Committee") was formed by Dean Jamieson. (DE # 97-2 at 7.) This committee had one Indian member out of three total. (DE # 103-1 at 10.) On December 15, 2006, the 2006 Inquiry Committee found insufficient evidence to conclude that a further investigative

committee should be formed to pursue the allegations of research misconduct brought up by Tsoukalas and Bertodano. (DE # 103-1 at 8; DE # 97-2 at 7.) On February 7, 2007, defendant issued a press release sharing the committee's conclusion. (DE # 103-1 at 9.)

In March 2007, United States Congressman Brad Miller of North Carolina urged defendant to renew its investigation into plaintiff. (DE # 103-1 at 10; DE # 97-2 at 8.) ONR Inspector General, Holly Adams, was also involved in this renewed investigation in an oversight capacity. (DE # 103-1 at 10; DE # 97-2 at 8.) After this, another inquiry committee was formed (the "2007 Inquiry Committee"). (DE # 103-1 at 10.) This committee had no Indian members out of five total. (*Id.* at 10.) The 2007 Inquiry Committee issued a report dated August 27, 2007 (*id.* at 12), in which it forwarded 12 allegations out of 34 total to an investigation committee (the "Investigative Committee") for adjudication. (*Id.* at 11-12.) The Investigative Committee did not have any non-whites. (*Id.* at 11.)

The Investigative Committee claims that it aggregated and restated some of the allegations forwarded by the 2007 Inquiry Committee "[f]or the sake of clarity." (DE # 97-20 at 5.) Plaintiff claims that the allegations were changed to include two new allegations which were not on the list forwarded by the 2007 Inquiry Committee. (DE # 103-1 at 12.) According to plaintiff, he had already been exonerated of these new allegations by the 2006 Inquiry Committee. (*Id.* at 13.) The Investigative Committee issued its final report on April 18, 2008, finding plaintiff guilty of two allegations of research misconduct. (DE # 97-20 at 2.) Specifically, the Investigative Committee found

that: (1) plaintiff compelled the addition of Butt's name as an author on one of the papers supporting plaintiff's prior research to create the appearance that Xu had collaborated with someone in researching and drafting the paper; and (2) plaintiff falsely stated, in a scientific paper, that his research and been "independently confirmed" by Xu, when the supposedly confirmatory work by Xu actually involved direct mentoring, editing, and promotion by plaintiff himself. (DE # 97-20 at 23.) On July 18, 2008, Purdue issued a press release stating the results of the investigation. (DE # 97-2 at 18.)

Plaintiff appealed the Investigative Committee's findings to an appellate committee (the "Appeals Committee"). (DE # 103-1 at 42.) The Appeals Committee upheld the Investigative Committee's decision in a report dated August 21, 2008. (DE # 97 at 17.) On August 27, 2008, plaintiff received notice via a letter from Purdue's Provost, Randy Woodson, that multiple sanctions would be levied on plaintiff. (*Id.* at 14-15.) Plaintiff was stripped of his named chair professorship, denied access to the associated discretionary funds, subjected to a salary reduction, was removed from the School of Nuclear Engineering Graduate Committee, and though he continued to advise students, he was denied the privilege of being recognized on theses as the Major Professor of the students. (*Id.* at 21.) Plaintiff further claims that, in October 2008, defendant instructed plaintiff to spend extra time and effort compiling work product, and denied plaintiff's requests for extra time and compensation. (*Id.* at 17.) Plaintiff complied with the request. (*Id.*) At some point in 2008, ONR subjected plaintiff to

debarment due to the findings of misconduct, rendering plaintiff unable to receive federal grants or contracts through 2011. (*Id.* at 20.) Plaintiff asserts that defendant denied plaintiff's requests for institutional assistance for contesting the debarment procedures and effectively "disowned" plaintiff and left him to "fend for himself" against ONR's attack. (*Id.* at 18, 52.) In 2009, Purdue declined to accept grant money that plaintiff had applied for and had been awarded. (*Id.* at 19-20.) Plaintiff also alleges that he was required to sign over the rights to an invention at some point after the announcement of his guilt. (*Id.* at 21.)

Plaintiff filed a charge with the Equal Employment Opportunity Commission ("EEOC") on February 14, 2009, claiming that defendant had permitted an environment of racial slurs, had levied disproportionate sanctions upon him, had fabricated allegations against him, and had violated its own rules, all because he was Indian. (DE # 103-8 at 29.) After receiving a right-to-sue letter from the EEOC, plaintiff filed the present *pro se* lawsuit on May 4, 2010, alleging that defendant violated Title VII of the Civil Rights Act of 1964 and committed several torts. (DE # 1.) After the case had been pending for over three years and the discovery period had closed (a period which had been generously extended numerous times by Magistrate Judge Andrew P. Rodovich), defendant filed a motion for summary judgment under FEDERAL RULE OF CIVIL PROCEDURE 56. (DE # 96.) After plaintiff filed his *pro se* response, defendant filed a RULE 56 motion to strike several affidavits filed by plaintiff with his response. (DE # 105.) Both motions are now fully briefed and ripe for review.

## II.    LEGAL STANDARD

FEDERAL RULE OF CIVIL PROCEDURE 56 requires the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). In responding to a motion for summary judgment, the non-moving party must identify specific facts establishing that there is a genuine issue of fact for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252 (1986); *Palmer v. Marion County,* 327 F.3d 588, 595 (7th Cir. 2003). In doing so, the non-moving party cannot rest on the pleadings alone, but must present fresh proof in support of its position. *Anderson,* 477 U.S. at 248; *Donovan v. City of Milwaukee,* 17 F.3d 944, 947 (7th Cir. 1994). A dispute about a material fact is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248. If no reasonable jury could find for the non-moving party, then there is no "genuine" dispute. *Scott v. Harris,* 550 U.S. 372, 380 (2007).

The court's role in deciding a summary judgment motion is not to evaluate the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. *Anderson,* 477 U.S. at 249-50; *Doe v. R.R. Donnelley & Sons Co.,* 42 F.3d 439, 443 (7th Cir. 1994). In viewing the facts presented on a motion for summary judgment, a court must construe all facts in a light most favorable to the non-moving party and draw all legitimate inferences and resolve all doubts in favor of that party. *NLFC, Inc. v. Devcom*

*Mid-Am., Inc.,* 45 F.3d 231, 234 (7th Cir. 1995). Importantly, the court is "not required to draw every conceivable inference from the record [in favor of the non-movant]-only those inferences that are reasonable." *Bank Leumi Le-Israel, B.M., v. Lee,* 928 F.2d 232, 236 (7th Cir. 1991) (emphasis added).

## III.   DISCUSSION

### A.    Motion to Strike

Defendant has moved to strike several affidavits plaintiff filed with his response brief. (DE # 105.) With or without these affidavits, defendant's motion for summary judgment succeeds. Accordingly, the court denies defendant's motion as unnecessary.

### B.    Tort Claims

Plaintiff has sued for intentional infliction of emotional distress, negligent infliction of emotional distress, and possibly also defamation. Defendant have moved for summary judgment on these tort claims on the grounds that plaintiff failed to adequately provide advance notice of the claims to defendant.

The Indiana Tort Claims Act ("ITCA") bars any claim against the state unless advance notice is provided to the state defendant. IND. CODE § 34-13-3-8.[3]   The notice

---

[3] The parties disagree about how much advance notice was required in this case. The notice requirement for municipal corporations is 180 days, IND. CODE § 34-13-3-8, whereas with respect to state agencies, a 270–day notice period applies. IND. CODE § 34-13-3-6. The Indiana Court of Appeals has held that Indiana state universities are political subdivisions for purposes of the Indiana Tort Claims Act. *Van Valkenburg v. Warner,* 602 N.E.2d 1046, 1048 (Ind. Ct. App. 1992). Accordingly, defendant is correct that the 180-day deadline applies in this case, though this fact matters little since the court concludes that plaintiff provided defendant with no notice at all.

must include the following information in a short and plain statement: (1) the circumstances that brought about the loss, (2) the extent of the loss, (3) the time and place the loss occurred, (4) the names of all persons involved if known, (5) the amount of damages sought, and (6) the residence of the person making the claim at the time of the loss and at the time of filing the notice. *Id.* § 34–13–3–10.

Plaintiff does not dispute that he never provided defendant with formal, advance notice of his tort claims. Instead, plaintiff makes several arguments in an attempt to convince the court that he substantially complied with the notice requirement. True, "notice is sufficient if it substantially complies with the content requirements of the statute." *Collier v. Prater,* 544 N.E.2d 497, 499 (Ind. 1989). In determining whether substantial compliance is established, the court looks to the purpose of the notice requirements, which is to inform state officials with reasonable certainty of the accident or incident and surrounding circumstances and to advise of the injured party's intent to assert a tort claim so that the state may investigate, determine its possible liability, and prepare a defense. *Irwin Mortg. Corp. v. Marion Cnty. Treasurer,* 816 N.E.2d 439, 446 (Ind. Ct. App. 2004). The claimant bears the burden of establishing substantial compliance. *Id.* at 439. Substantial compliance with the notice requirement of the ITCA is a question of law. *Id.*

First, plaintiff argues that his EEOC charge, which he filed with the EEOC and in which he alleges violations of his civil rights, provided defendant with notice of his tort claims. This argument fails. *Robinson v. Leonard-Dent,* No. 3:12CV417-PPS, 2013 WL

5701067, at *12 (N.D. Ind. Oct. 18, 2013) ("[T]hose [EEOC] charges, although in writing, were not filed with the [defendant] and would have apprised the [defendant] of impending claims under Title VII and Indiana civil rights laws, but not of tort claims. The ITCA notice must also be filed with 'the governing body of [the] political subdivision' and 'must be delivered in person or by registered or certified mail.' The administrative charges are not shown to have met these requirements either."). Plaintiff also alludes to an argument that his complaint itself suffices as notice, citing *City of Hobart Sewage Works v. McCullough,* 656 N.E.2d 1185 (Ind. Ct. App. 1995), but the *City of Hobart* ruling was abrogated by *Kantz v. Elkhart County Highway Department,* 701 N.E.2d 608, 616 (Ind. Ct. App. 1998), over fifteen years ago. Accordingly, this argument is also rejected.

Finally, plaintiff argues that he "kept Dr. Bralts aware of all of these developments from 2006 onwards through 2010 on a very timely basis." (DE # 102 at 7.) A similar argument was recently rejected by the Indiana Court of Appeals in *Chang v. Purdue University,* 985 N.E.2d 35, 52 (Ind. Ct. App. 2013). In that case, the plaintiff contended that she substantially complied with the notice requirement because she sent letters to the university's chancellor and president, as well as a demand letter to the university. *Id.* The court rejected the plaintiff's argument, finding that even if the defendant was "familiar with the situation and already knew all of th[e] information" that the ITCA required a plaintiff to include in the notice, "'[the defendant's] independently acquired knowledge or routine investigation of an occurrence was

insufficient to show substantial compliance with the notice statute.'" *Id.* at 53 (quoting *Fowler v. Brewer,* 773 N.E.2d 858, 864 (Ind. Ct. App. 2002)). The court stressed that the case "involve[d] more than a mere technical shortcoming. It appears instead that Chang did not consider the ITCA, and particularly its requirements governing notice." *Id.* at 54. The court further concluded that "'[w]hile this court has interpreted the notice statutes to allow substantial compliance when a claimant has taken affirmative steps to notify the governmental entity, we cannot find substantial compliance when the claimant took no steps whatsoever to comply with the notice statute[.]'" *Id.* (quoting *Brown v. Alexander,* 876 N.E.2d 376, 383 (Ind. Ct. App. 2007)).

This case is parallel to *Chang.* Like *Chang,* "this is not a case where a claimant sought to comply with the ITCA's notice requirement provisions, but fell short." *Id.* at 54. Rather, plaintiff has pointed to no evidence that he made any affirmative steps towards compliance with the ITCA or its notice provision. Accordingly, summary judgment is appropriate on plaintiff's tort claims.

## C. Title VII Claims

Plaintiff has also sued under Title VII, which forbids an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to [the individual's] compensation, terms, conditions, or privileges of employment, because of such individual's race, color . . . or national origin." 42 U.S.C. § 2000e-2(a). The crux of plaintiff's complaint is his "disparate treatment" claim– that is, his claim that he was intentionally treated differently by

defendant because he is Indian. The court's analysis of that claim constitutes the majority of the opinion below. However, plaintiff includes several other discrimination "key words" in his various filings, such as "disparate impact," "retaliation," and "harassment." The court addresses these concepts at the conclusion of this section. But before the court considers any of plaintiff's Title VII claims, it must first determine whether plaintiff's Title VII allegations have been timely raised.

### 1. Timeliness

"Section 2000e–5(e)(1) requires that a Title VII plaintiff file a charge with the Equal Employment Opportunity Commission (EEOC) . . . 300 days 'after the alleged unlawful employment practice occurred.'" *Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 104–05 (2002) (citing 42 U.S.C. § 2000e–5). In this case, plaintiff filed his charge of discrimination with the EEOC on February 14, 2009. (DE # 103-8 at 29.) Defendant contends that any claim based on facts occurring before April 20, 2008 (300 days before plaintiff's first EEOC charge) is time-barred. Plaintiff, perhaps cognizant of the fact that many of his allegations concern events that occurred several years ago, argues that his allegations are timely under the "continuing violation doctrine," a concept which warrants some introduction.

In *Morgan,* the Supreme Court explained under what circumstances a plaintiff may properly rely on the continuing violation doctrine to recover for discriminatory acts that fall outside the 300–day limitations period. Operation of the doctrine depends upon whether the discriminatory acts alleged constitute "discrete" discriminatory acts,

or whether they are acts contributing to a hostile work environment. *Morgan,* 536 U.S. at 114–15. With respect to "discrete" acts, each act "starts a new clock for filing charges," and the clock starts on the date that the act "occurred." *Id.* at 113. Any discrete discriminatory acts that fall outside the statute of limitations are time-barred even though they may relate to other discrete acts that fall within the statute of limitations. *Id.* at 112–13. Further, "discrete acts that fall within the statutory time period do not make timely acts that fall outside the time period." *Id.* at 112. The Court provided specific examples of discrete acts "such as termination, failure to promote, denial of transfer, or refusal to hire." *Id.* at 114. The Court also noted that these acts "are easy to identify" because "[e]ach incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice.'" *Id.*

On the other hand, the second set of acts, those contributing to a hostile work environment, involve "repeated conduct" that "may not be actionable on its own." *Id.* at 115. Instead, "[s]uch claims are based on the cumulative effect of individual acts." *Id.* In such cases, "[i]t does not matter, for purposes of the statute, that some of the component acts of the hostile work environment fall outside the statutory time period. Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." *Id.* at 117; *see also Hildebrandt v. Illinois Dep't of Nat. Res.,* 347 F.3d 1014, 1027 (7th Cir. 2003). The Court concluded that the "incidents constituting a hostile

work environment are part of one unlawful employment practice." *Morgan,* 536 U.S. at 118.

Plaintiff's filings allege a litany of alleged adverse employment actions that he suffered at the hands of defendant. First, plaintiff alleges that in August of 2008, plaintiff received a letter from Provost Woodson informing him of multiple sanctions: plaintiff was allegedly stripped of his named chair professorship, denied access to the associated discretionary funds, subjected to a salary reduction, was removed from the School of Nuclear Engineering Graduate Committee, and was denied the privilege of being recognized on theses as the Major Professor of students. (DE # 103-1 at 14-15, 21.) According to plaintiff, defendant issued embarrassing press releases in violation of its own policies (*id.* at 12, 14-15) and selected an Appeals Committee of all white individuals (*id.* at 42). Plaintiff also alleges that defendant forced him to do work without compensation in October of 2008 (*id.* at 17), denied plaintiff's requests for institutional assistance for contesting the Navy's debarment procedures at some point in 2008 (*id.* at 18), declined to accept grant money on plaintiff's behalf in 2009 (*id.* at 20), and forced him to sign over rights to his invention after the announcement of his guilt (*id.* at 21). All of these alleged actions occurred within 300 days of plaintiff's EEOC charge, so the court considers the allegations timely.

However, numerous other "discrete" acts are presented in plaintiff's filings which are untimely because they occurred prior to April 20, 2008. First, plaintiff alleges that defendant rigged the racial make-up of the committees used to investigate his

research. With the exception of the Appeals Committee (mentioned in the preceding paragraph), all of the committees were formed in 2006 and 2007, rendering these allegations untimely. Plaintiff also alleges that the Investigative Committee fabricated allegations, but it concluded its work with the issuance of its final report on April 18, 2008, so this allegation is untimely as well. Next, plaintiff claims that as a result of the Tsoukalas Inquiry Committee, plaintiff's lecture course was summarily terminated by Tsoukalas, he was denied post-doctoral hires and reappointments, defendant refused to submit proposals to the federal government, and plaintiff was removed from the university webpage. However, the Tsoukalas Inquiry Committee convened and authored its report in February of 2006, and Tsoukalas only had authority over plaintiff until August of 2006, so plaintiff's complaints in this regard are untimely. Plaintiff further claims that Rutledge invited Tsoukalas and Bertodano to submit allegations of research misconduct against plaintiff, and that in September of 2006, Tsoukalas and Bertodano complied. These allegations are also untimely. Any Title VII claims based upon the aforementioned facts are time-barred.

Plaintiff also submitted three affidavits in response to defendant's motion for summary judgment which present facts that are more properly characterized as "non-discrete actions." Specifically, plaintiff alleges that three co-workers heard Tsoukalas utter race-related comments about plaintiff. First, Darla Mize attested that Tsoukalas uttered the phrases "stupid Indians" and "useless Indians," and stated that he hated Indians. (DE # 103-6 at 7.) Second, Erica Timmerman stated that Tsoukalas said that

once the authorities found plaintiff guilty of fraud, he would be forced to go back to India. (*Id.* at 11.) And finally, Jere Jenkins stated that Tsoukalas told him that plaintiff was going to be deported back to India because of his fraudulent research. (*Id.* at 23.) The court assumes, without deciding, that the "cumulative effect" of the acts could support a hostile work environment claim. *Morgan,* 536 U.S. at 115. However, in order for the entire time period of the hostile environment to be considered by a court, *Morgan* requires that "*an* act contributing to the claim occurs within the filing period." *Id.* at 117. In this case, all of the allegations appeared in affidavits dated February 2, 2008, meaning Tsoukalas's alleged comments were necessarily uttered prior to that date (and thus prior to April 20, 2008), rendering all of the allegations untimely. Accordingly, plaintiff cannot base his Title VII claim on Tsoukalas's alleged comments.

### 2. Disparate Treatment

Having narrowed the scope of plaintiff's claims, in terms of timeliness, the court now considers plaintiff's major theory of recovery under Title VII: disparate treatment. Disparate treatment "is the most easily understood type of discrimination. The employer simply treats some people less favorably than others because of their race, color, . . . or national origin." *Int'l Bhd. of Teamsters v. United States,* 431 U.S. 324, 335 n.15 (1977). "Proof of discriminatory motive is critical" to such a claim, *id.*, though it can be proven in two different ways: either by proffering evidence that racial discrimination motivated the employment decision (known as the direct method), or by relying on the indirect, burden-shifting method outlined in *McDonnell Douglas Corp. v. Green,* 411 U.S.

16

792 (1973). *Nichols v. S. Ill. Univ.-Edwardsville,* 510 F.3d 772, 783 (7th Cir. 2007). Importantly, the existence of an "adverse employment action" is necessary regardless of the method employed. *Rhodes v. Illinois Dep't of Transp.,* 359 F.3d 498, 504 (7th Cir. 2004). Accordingly, the court first considers which of the consequences plaintiff alleges defendant imposed upon him constitute legally actionably "adverse employment actions" under Title VII.

### a.    Adverse Employment Actions

"An adverse employment action is 'a materially adverse change in the terms and conditions of employment [that is] more disruptive than a mere inconvenience or an alteration of job responsibilities.'" *Stockett v. Muncie Ind. Transit Sys.,* 221 F.3d 997, 1001 (7th Cir. 2000) (quoting *Crady v. Liberty Nat'l Bank & Trust Co.,* 993 F.2d 132, 136 (7th Cir. 1993)) (alteration in *Stockett*). "Adverse employment actions encompass more than simply the termination of employment or a decrease in salary. They also may include actions such as bestowing on an employee 'a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation.'" *Id.* (quoting *Crady,* 993 F.2d at 136).

Though many of plaintiff's allegations are not supported by evidence, some of his alleged experiences appear to qualify as adverse employment actions under Title VII. In this category are plaintiff's allegations that he was stripped of his named chair professorship, denied access to the associated discretionary funds, subjected to a salary reduction, removed from the School of Nuclear Engineering Graduate Committee, and

denied the privilege of being recognized on theses as the Major Professor of students. (DE # 103-1 at 14-15, 21.) Plaintiff also alleges that defendant forced him to do work without compensation (DE # 103-1 at 17), denied plaintiff's requests for institutional assistance for contesting the Navy's debarment procedures (*id.* at 18), declined to accept grant money on plaintiff's behalf (*id.* at 20), and was required to sign over rights to his invention to defendant at some point after the announcement of his guilt (*id.* at 21). For purposes of this opinion, the court considers the aforementioned consequences adverse employment actions.

However, plaintiff also claims that, as a result of defendant's actions, his professional standing in society has been ruined, he has been embarrassed and humiliated, he has lost the opportunity to receive international recognition and awards, and he has been deprived of a fundamental right to pursuit of happiness. (DE # 103-4 at 30, 40-42). These alleged consequences do not constitute "adverse employment actions" for purposes of Title VII, so plaintiff's claim cannot rest upon them. *Spring v. Sheboygan Area Sch. Dist.,* 865 F.2d 883, 886 (7th Cir. 1989) (change in public perception is not adverse employment action); *O'Neal v. City of Chicago,* 317 F. Supp. 2d 823, 828 (N.D. Ill. 2004), *aff'd,* 392 F.3d 909 (7th Cir. 2004) ("O'Neal cites no authority – and this Court finds no controlling authority – for the proposition that a 'tarnished reputation' is sufficient for establishing an adverse employment action."); *Stewart v. Evans,* 275 F.3d 1126, 1136 (D.C. Cir. 2002) (public humiliation or loss of reputation does not constitute an adverse employment action under Title VII"); *see also Smart v. Ball State Univ.,* 89 F.3d

437, 441 (7th Cir. 1996) ("not everything that makes an employee unhappy is an actionable adverse action").

b.      *Direct Method*

The court now addresses plaintiff's attempt to ward off defendant's motion for summary judgment. As mentioned above, plaintiff can do this using either the direct or indirect method, *Nichols,* 510 F.3d at 783, and the court begins, here, with the direct method. "The relevant question under the direct method is whether the evidence 'points directly' to a discriminatory motive for the employer's decision." *Naficy v. Illinois Dep't of Human Servs.,* 697 F.3d 504, 509 (7th Cir. 2012) (quoting *Kodish v. Oakbrook Terrace Fire Prot. Dist.,* 604 F.3d 490, 501 (7th Cir. 2010)). Thus, "[t]o avoid summary judgment using the 'direct method,' a plaintiff must marshal sufficient evidence, either direct or circumstantial, that an adverse employment action was motivated by discriminatory animus." *Id.* (citing *Coleman v. Donahoe,* 667 F.3d 835, 845 (7th Cir. 2012)). Each type of evidence (both direct and circumstantial) is addressed in turn below.

Direct evidence is, essentially, an admission by the employer itself. *Fleishman v. Cont'l Cas. Co.,* 698 F.3d 598, 603 (7th Cir. 2012). In this case, plaintiff asserts only three pieces of evidence that could possibly be construed as direct evidence. Specifically, plaintiff presents the affidavits of three co-workers, each of whom claim they heard Tsoukalas say racially-disparaging comments about plaintiff.[4] In summary, Mize

_____

[4] While these comments cannot form the basis of a Title VII claim on their own, as they were not timely asserted, they still may be used to support a timely-made claim. *West v. Ortho–McNeil Pharm. Corp.,* 405 F.3d 578, 581 (7th Cir. 2005).

attested that Tsoukalas used the phrases "stupid Indians" and "useless Indians," and said that he hated Indians (DE # 103-6 at 7), Timmerman stated that Tsoukalas said that once the authorities found plaintiff guilty of fraud, he would be forced to go back to India (*id.* at 11), and Jenkins said that Tsoukalas told him that plaintiff was going to be deported back to India because of his fraudulent research (*id.* at 23).

Plaintiff admits that as of August 2006, Tsoukalas no longer served as head of the School of Nuclear Engineering and at that point ceased to be plaintiff's supervisor. It is not completely clear who the decisionmakers were for each of the timely-raised consequences that this court has agreed to consider "adverse employment actions," but it *is* clear that in all instances the decisionmaker was not Tsoukalas. (For example, the sanctions imposed on plaintiff in August of 2008, including his salary reduction and change in title, were imposed by Provost Woodson.) Because Tsoukalas was not a decisionmaker for any of the timely-alleged actions that constitute adverse employment actions, plaintiff's only route to recovery under the direct method of proof via direct evidence is the "cat's paw" theory, which permits a plaintiff to argue that a discriminatory non-decisionmaker so infected the decision-making process with his discriminatory motives that the employer should be held liable. *See Martino v. MCI Comm. Servs., Inc.,* 574 F.3d 447, 452 (7th Cir. 2009); *Cook v. IPC Int'l Corp.,* 673 F.3d 625, 628 (7th Cir. 2012) ("In employment discrimination law the 'cat's paw' metaphor refers to a situation in which an employee is fired or subjected to some other adverse employment action by a supervisor who himself has no discriminatory motive, but who

has been manipulated by a subordinate who does have such a motive and intended to bring about the adverse employment action.").[5]

In 2010, the Supreme Court issued its ruling in *Staub v. Proctor Hospital,* 131 S. Ct. 1186, 1193 (2011), setting forth a clarified standard with regard to the cat's paw theory as it applied in a case involving the Uniformed Services Employment and Reemployment Rights Act of 1994, 38 U.S.C. § 4301 *et seq.* In *Staub,* the Court held that the "recommendations of [non-decision-makers] that were designed and intended to produce the adverse action" may support imposition of liability on the employer. 131 S.Ct. at 1193. According to the Court, the question is whether the non-decisionmaker's actions were a "causal factor," based on common-law proximate cause principles, in the termination decision. *Id.* The court emphasized that prior cases, in which courts frequently held that an employer's independent investigation of the circumstances prior to taking the adverse employment action precluded employer liability under a cat's paw theory, were now obsolete. "[T]he [non-decisionmaker]'s biased report may remain a causal factor if the independent investigation takes it into account without determining that the adverse action was, apart from the [non-decisionmaker]'s recommendation, entirely justified." 131 S. Ct. at 1193. However, "if the employer's investigation results in an adverse action for reasons unrelated to the [non-decision-maker]'s original biased action . . . , then the employer will not be liable." *Id.* Though the

---

[5] The cat's paw theory derives from a fable in which a monkey, who wants chestnuts that are roasting in a fire, persuades a cat to retrieve the chestnuts for him. The cat does so, but burns its paw in the process. *Cook,* 673 F.3d at 628.

Seventh Circuit has not ruled definitively on the matter, it appears to assume that the *Staub* holding also applies to Title VII cases. *See, e.g., Cook,* 673 F.3d at 628.

After *Staub,* the Seventh Circuit held that it was "appropriate to impute discriminatory or retaliatory animus to a decisionmaker when the party nominally responsible for a decision is, by virtue of [his] role in the company, totally dependent on another employee to supply the information on which to base that decision." *Hicks v. Forest Pres. Dist.,* 677 F.3d 781, 790 (7th Cir. 2012). In *Hicks*, the Seventh Circuit held that the jury properly found that a supervisor's animus could be imputed to the ultimate decisionmaker because the latter had "relied on" a series of disciplinary forms that the supervisor had provided in deciding to offer the plaintiff demotion or termination. In other words, the decisionmaker was "dependent on another employee to supply the information" upon which the decision was based. *Id.* Similarly, in *Smith v. Bray,* 681 F.3d 888, 899-900 (7th Cir. 2012), the Seventh Circuit held that a genuine issue of fact existed as to whether a non-decisionmaker intentionally helped to cause an adverse employment action where that employee was "involved at every stage" of the controversy, including regularly participating in termination decisions, frequently speaking to decisionmakers prior to the plaintiff's termination, and writing the report requesting termination. *See Smith,* 681 F.3d at 900.

In this case, plaintiff lacks sufficient direct evidence to establish that Tsoukalas's alleged animus proximately caused any of the final decisionmakers involved in any of the adverse employment actions at issue in this case to make the decisions they made.

Plaintiff's only arguable source of direct evidence of racial animus (the three affidavits of colleagues who overheard Tsoukalas make race-related remarks about plaintiff) could only prove that Tsoukalas, himself, harbored animosity against plaintiff. There is no evidence that Tsoukalas communicated these feelings to any of the ultimate decisionmakers (for example, Provost Woodson, who ultimately stripped plaintiff of his named chair professorship and reduced plaintiff's salary, amongst other sanctions, in August of 2008). There is no evidence that Tsoukalas communicated his disparaging thoughts about plaintiff to anyone other than the three colleagues whose affidavits are before the court, and none of those colleagues had any decisionmaking responsibility with regard to plaintiff's employment.

Nor can it be said that the decisionmakers were "dependent on" Tsoukalas to supply the information upon which the decisions were based. *Hicks,* 677 F.3d at 790. According to plaintiff's own version of the facts, Tsoukalas was not the only one to submit an allegation of research misconduct to Dean Jamieson; Bertodano also submitted allegations at the urging of Rutledge. Accordingly, even if Tsoukalas had not reported plaintiff for research misconduct, the seeds of suspicion would still have been planted by Rutledge and Bertodano. Further, plaintiff alleges that Tsoukalas submitted the allegation of research misconduct at the urging of Rutledge, "instead of being responsible for doing so on [his] own as would be the norm for other faculty." (DE # 103-1 at 8.) Plaintiff states that Rutledge "proactively 'invited' and effectively cajoled/encouraged by Defendant administrators to submit allegations of misconduct."

(*Id.* at 30.) Thus, plaintiff's facts suggest that it was actually Rutledge's alleged disdain for plaintiff that spurred the investigation into plaintiff, not Tsoukalas's.

Similarly, the record does not support any inference that Tsoukalas was "involved at every stage" of the controversy. *Smith,* 681 F.3d at 900. After Tsoukalas submitted the allegation of research misconduct to Dean Jamieson, two different inquiry committees, one investigation committee, and one appeals committee considered the allegations against plaintiff before he, ultimately, was sanctioned. *Martino,* 574 F.3d at 452-53 (finding persuasive the fact that even if one participant in the process was prejudiced, "there were not one but two layers of bias-free analysis" between the prejudiced participant and the ultimate decisionmaker). Based on the evidence in the current record, it is not reasonable to infer that Tsoukalas's bias infected every layer of review. In sum, plaintiff cannot succeed via the direct method of proof by relying on direct evidence because he cannot create an issue of fact with regard to proximate causation.

Though plaintiff's direct evidence does not raise an inference of discrimination, plaintiff may rely upon circumstantial evidence to accomplish this goal. *Gleason v. Mesirow Fin., Inc.,* 118 F.3d 1134, 1140 (7th Cir. 1997). This is often referred to as the "convincing mosaic" approach. *Coleman,* 667 F.3d at 860. When analyzing a case under the "convincing mosaic" or circumstantial evidence approach, "[t]he ultimate question the parties and the court always must answer is whether it is more likely than not that the plaintiff was subjected to the adverse employment action because of his protected

status or activity. To answer that question, the individual 'bits and pieces' presented by the plaintiff must be put into context and considered as a whole." *Hobgood v. Ill. Gaming Bd.,* 731 F.3d 635, 644 (7th Cir. 2013) (citing *Coleman,* 667 F.3d at 860). Some types of circumstantial evidence commonly used in discrimination cases are evidence of suspicious timing, statements and behavior toward other employees in the protected group, evidence that employees similarly situated to the plaintiff received systematically better treatment, and evidence that the employer's stated reason for the adverse employment action is a mere pretext for discrimination. *Troupe v. May Dep't Stores Co.,* 20 F.3d 734, 736 (7th Cir. 1994); *Coleman,* 667 F.3d at 860.

Plaintiff's proffered "evidence" is lengthy, but can be summarized as follows. First, plaintiff insists that Tsoukalas infected the investigation process with his racial animus; specifically, plaintiff points to the fact that three of his colleagues overheard Tsoukalas make comments that had some connection to plaintiff's race. Plaintiff also points out that Tsoukalas improperly initiated an inquiry committee to look into potential misconduct on plaintiff's part, disseminated information to the press, and did not properly notify plaintiff or the university of the inquiry he had initiated, all in violation of Purdue policies. Plaintiff further alleges that the committees involved in the review of his case were composed of mostly white people. Next, plaintiff alleges that his white collaborators did not receive similar sanctions at their home institutions. Plaintiff also asserts that Purdue violated its own policies by disclosing information regarding his research misconduct proceedings in a press release in July of 2008 and another one

after he was sanctioned, both without his permission. Plaintiff contends that Purdue further violated its own policies by not including academics with the proper credentials on the review committees. Finally, plaintiff insists that, through some clever slight-of-hand tricks, the Investigative Committee inappropriately injected two new allegations of misconduct into the fray, which had not been forwarded by the 2007 Inquiry Committee, and of which plaintiff had been acquitted by the 2006 Inquiry Committee.[6]

The Seventh Circuit Court of Appeals addressed a similar set of allegations in *Tank v. T-Mobile USA, Inc.,* 758 F.3d 800 (7th Cir. 2014), a case brought pursuant to 42 U.S.C. § 1981.[7] In that case, the employer had received two complaints about the plaintiff, suggesting that plaintiff might have been authorizing questionable expenditures for personal gain and disregarding the commands of his supervisor to fire a subordinate. The defendant initiated an investigation of plaintiff, which resulted in a report which found the plaintiff had indeed violated company policies. The report was given to plaintiff's supervisor, who determined (based upon the report) that plaintiff should be fired. The plaintiff sued claiming that he was discriminated and retaliated

---

[6] Whether any of these allegations are actually supported by the evidence (most are not) is largely immaterial for purposes of this analysis. The court assumes, without deciding, that they are true. *But even if all of plaintiff's assertions are true*, plaintiff does not present a convincing mosaic of evidence suggesting discriminatory animus on defendant's part, as explained herein.

[7] Section 1981 bars employers from discriminating against employees based on their race or national origin, and at the summary judgment phase Section 1981 claims are analyzed similarly to Title VII claims (*i.e.,* claims can be proven through direct or indirect methods of proof). *Tank,* 758 F.3d at 805.

against based on his race and national origin. The plaintiff relied on the direct method of proof for his discrimination claim, arguing that circumstantial evidence created an issue of fact as to whether discriminatory animus motivated the employer's decision to fire him. The plaintiff argued that the investigation was suspicious, that the company departed from its normal procedures in extraordinary ways, and that employee comments and behavior had been directed towards Indians. *Id.* at 806.

The Seventh Circuit Court of Appeals held that no inference of discrimination could be made based on these allegations. Plaintiff's allegations regarding disparaging comments about Indians made by employees did not support his case; one of the accused employees was not a decisionmaker for the adverse employment action, so his comments did not demonstrate that he was fired for discriminatory reasons, and the second employee, who was actually plaintiff's supervisor, made the alleged comments more than three years before the adverse employment action occurred. The Seventh Circuit, noting a prior decision that comments made over a year before the adverse action could not constitute evidence of discrimination under the direct method, held that this three-year lapse in time was simply too long for the comment to contribute to any inference of discriminatory animus. *Id.* at 806-07. The court further rejected the plaintiff's assertion that the investigation was improperly handled, as the plaintiff had failed to point to any company policies that had been violated. Further, plaintiff's argument that the investigation was suspicious failed because several sources had

complained about plaintiff's misconduct, and no evidence was presented that the complaints were orchestrated by the company as a way to undermine him. *Id.*

Plaintiff's allegations similarly fail. Tsoukalas's alleged comments and his failure to follow protocol constitute the most damning evidence, yet (as explained above) they speak only to the possible animus of Tsoukalas, who was not a decisionmaker for any of the adverse employment actions at issue. Further, his inquiry committee was founded in 2006 and his alleged comments were made at some point prior to February 2, 2008 (the date of the affidavits of plaintiff's colleagues); these dates are more than two years prior to any adverse employment action that the court is considering in this case and fail to raise an inference that any of the relevant adverse employment actions were motivated by discriminatory animus.

Further, plaintiff's attacks on the investigation do not fair any better than the plaintiff's in *Tank*. The fact that the committees consisted primarily of white individuals is worth considering, but without any other proof of the committee members' motivations, plaintiff's proffered "evidence" on this point requires the court to make the "illogical and insupportable assumption that every time a [white committee] member votes against a[n Indian] candidate, the decision is motivated by race." *Pilditch v. Bd. of Educ. of City of Chicago,* 3 F.3d 1113, 1119 (7th Cir. 1993). As the Seventh Circuit has aptly stated, "[t]his is impermissible. . . . The notion that all [white] decision-makers are driven by this single issue rests on just the type of stereotype the civil rights laws were designed to prevent from infecting personnel decisions; it would be painfully

ironic if those same laws were here used to perpetuate such stereotypes." *Id.* Without some additional "hard evidence" regarding the committee members' motivations, plaintiff's assertion that the committees evaluating him were made up of mostly white people carries very little weight.

As for plaintiff's assertion that his white collaborators were not treated as harshly as he was, plaintiff admits that plaintiff's white collaborators *were not employees of Purdue*, but rather employees of different universities. (DE # 102 at 19.) Plaintiff cannot point to individuals not employed by defendant to demonstrate the existence of similarly situated employees. *Tate v. Ancell,* 551 F. App'x 877, 889 (7th Cir. 2014) (employees of different employer were not similarly situated).

The remaining allegations are that defendant violated its own policies (by populating the committees with improperly credentialed committee members, by issuing press releases, and by reintroducing old allegations of which plaintiff had already been acquitted). Plaintiff claims that the policies regarding issuing press releases and inserting allegations into investigations have since been changed, demonstrating defendant's awareness of its violation of the policies in plaintiff's case. (DE # 103-1 at 16.) Whether this is true or not is not material. Even assuming that defendant violated its own policies in all of the ways plaintiff claims, these facts would constitute the entirety of the mosaic of circumstantial evidence in plaintiff's favor, and they do not present a convincing one. *Guinto v. Exelon Gen. Co.,* LLC, 341 F. App'x 240, 247 (7th Cir. 2009) (failure of employer to follow its own policies, without more, does

not raise inference of discrimination); *Kohut v. Home Depot U.S.A., Inc.,* No. 09 C 4321, 2010 WL 5288172, at *7 (N.D. Ill. Dec. 16, 2010) (discrimination cannot be reasonably inferred under direct method of proof merely from fact that employer failed to follow its own policies). A perfect investigation is not required by Title VII. "Employers may act for many reasons, good and bad . . . unless they act for a forbidden reason, these errors . . . do not matter." *Kuhn v. Ball State Univ.,* 78 F.3d 330, 332 (7th Cir. 1996). The fact that defendant made errors during the course of its investigation of plaintiff does not demonstrate that defendant took action against plaintiff *because of his race*. In short, because plaintiff's proffered evidence does not "point directly" to discrimination, his disparate treatment claim fails under the direct method. *Naficy,* 697 F.3d at 510.

*c.*      *Indirect Method*

This is not the end of plaintiff's case, however. In a line of cases beginning with *McDonnell Douglas,* 411 U.S. at 802, the Supreme Court developed a burden-shifting framework known as the "indirect method" of proof, designed to "sharpen the inquiry into the elusive factual question of intentional discrimination." *Coleman,* 667 F.3d at 845. The *McDonnell Douglas* method has three steps. The first step requires a plaintiff to establish a prima facie case of discrimination. *Cung Hnin v. TOA (USA), LLC,* 751 F.3d 499, 504 (7th Cir. 2014). If the plaintiff does so, then the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment action. *Id.* If the employer meets this burden, the burden shifts back to the plaintiff to present evidence that the employer's reason is pretext for unlawful discrimination. *Id.*

To successfully establish a prima facie case of intentional discrimination, a plaintiff must provide evidence that: (1) he is a member of a protected class; (2) he was meeting his employer's legitimate performance expectations; (3) he suffered an adverse employment action; and (4) other similarly-situated employees outside of the protected class were treated more favorably. *Huang v. Cont'l Cas. Co.,* 754 F.3d 447, 450 (7th Cir. 2014). The purpose of the prima facie case is to screen out cases "where the plaintiff fails to distinguish his or her case from the ordinary, legitimate kind of adverse personnel decision." *Jayasinghe v. Bethlehem Steel Corp.,* 760 F.2d 132, 134 (7th Cir. 1985). The plaintiff carries the initial burden of establishing a prima facie case of discrimination. *McDonnell Douglas,* 411 U.S. at 802.

The court has already addressed the third element of plaintiff's prima facie case by narrowing plaintiff's claim down to a group of actions that this court is considering "adverse employment actions" for purposes of this opinion, and the first element is not disputed. As for the second element, defendant argues that the findings of research misconduct by the Investigation Committee show that plaintiff was not meeting defendant's legitimate expectations. Further, defendant argues that plaintiff cannot establish the fourth element because he has not pointed to any similarly-situated employees outside of the protected class who were treated more favorably. Defendant makes good arguments on both of these points. However, in order to provide plaintiff with the full benefit of the doubt, the court resolves both of these elements in plaintiff's favor. As for the second part of the burden-shifting test, defendant easily states a

legitimate non-discriminatory reason for its actions against plaintiff– namely, the fact that the Investigative Committee found plaintiff guilty of two counts of research misconduct, and the Appeals Committee upheld this finding. This leaves the court left to consider the issue of pretext.

"'Pretext for discrimination' means more than an unusual act; it means something worse than a business error; 'pretext' means deceit used to cover one's tracks." *Clay v. Holy Cross Hosp.,* 253 F.3d 1000, 1005 (7th Cir. 2001) (internal citations omitted); *see also Russell v. Acme–Evans Co.,* 51 F.3d 64, 68 (7th Cir. 1995) (pretext means a lie, specifically a phony reason for some action*). The question is not whether defendant properly evaluated plaintiff, but whether defendant's reason for acting against him was honest. *Millbrook v. IBP, Inc.*, 280 F.3d 1169, 1175 (7th Cir. 2002). Thus, even if defendant's reasons for taking action against plaintiff were "mistaken, ill considered or foolish, so long as [defendant] honestly believed those reasons, pretext has not been shown." *Jordan v. Summers,* 205 F.3d 337, 343 (7th Cir. 2000); *see also Naik v. Boehringer Ingelheim Pharm., Inc.,* 627 F.3d 596, 601 (7th Cir. 2010) (whether employer made "correct decision" is not a question for the court at pretext stage); *Forrester v. Rauland-Borg Corp.,* 453 F.3d 416, 418 (7th Cir. 2006) ("[T]he question is never whether the employer was mistaken, cruel, unethical, out of his head, or downright irrational in taking the action for the stated reason, but simply whether the stated reason was his reason: not a good reason, but the true reason."). If defendant's legitimate, non-

discriminatory reason is a "true ground" and not a pretext, "the case is over." *Naik,* 627

F.3d at 601.

The court already summarized plaintiff's body of "evidence" (much of it

consisting simply of allegations) in the circumstantial evidence discussion, above, but

the court will address all of the same "evidence" again here in order to determine

whether plaintiff has demonstrated that defendant's given reasons for its actions are

pretextual.[8] First, Tsoukalas's race-related comments and failure to follow protocol are

not probative of whether the ultimate decisionmakers honestly believed plaintiff was

guilty of research misconduct; Tsoukalas was not a decisionmaker for any of the

adverse employment actions being considered in this case and, as explained in detail

above, there is insufficient evidence to conclude that any ultimate decisionmaker was a

"cat's paw."

---

[8] A demonstration of pretext is one type of circumstantial evidence that can become part of a convincing mosaic of circumstantial evidence under the direct method of proof, so this analysis resembles the foregoing circumstantial evidence discussion in some ways. Further, since plaintiff did not specifically point to what evidence he thought supported a convincing mosaic argument and what evidence he thought established pretext, the court considers all of the seemingly relevant evidence referenced in plaintiff's brief for both questions. In this way, too, the pretext analysis looks much like the circumstantial evidence discussion. However, while the question in the circumstantial evidence context was "do all of the bits and pieces add up to discrimination?", the question in the pretext context is "is there evidence suggesting that defendant is lying about its reasons for taking action against plaintiff?" In short, the court essentially considers the same evidence through two different lenses– previously through a circumstantial evidence (direct method) lens, and now through a pretext (indirect method) lens, in order to give plaintiff the full benefit of the doubt in this case.

Plaintiff's allegations regarding the flaws in the investigatory process are also not probative. In *Kariotis v. Navistar Int'l Transp. Corp.,* 131 F.3d 672, 677 (7th Cir. 1997), the Seventh Circuit stated that while a company's investigation of one of its employees "hardly look[ed] world-class," the plaintiff's "energy [was] misspent by attacking the company's decisional process" at the pretext phase of the burden-shifting analysis. *Id.*; *see also Hugley v. Art Inst. of Chicago,* 3 F. Supp. 2d 900, 907-08 (N.D. Ill. 1998) ("The issue here is not the adequacy of Koverman's investigation, the sufficiency of the evidence before the grievance committee, or even whether the alleged threat actually occurred. . . . Hugley must show that [his employers] did not honestly believe that Hugley threatened Hall."). The *Kariotis* court concluded that "a reason honestly described but poorly founded is not a pretext as that term is used in the law of discrimination." 131 F.3d at 677 (internal quotation marks omitted).

In this case, plaintiff's attack on the investigatory process is also energy misspent. Plaintiff's allegations regarding the makeup of the committees (both in terms of race and academic qualifications) fail to suggest that defendant did not honestly believe that plaintiff had committed research misconduct. The same is true for plaintiff's allegations that the Investigation Committee "fabricated" allegations against him by wrongly re-introducing old allegations back into the investigation. *Forrester v. Rauland-Borg Corp.,* 453 F.3d 416, 419 (7th Cir. 2006) ("Suppose the complaint of sexual harassment in this case had been a pure fabrication, with no basis in fact whatsoever-yet it was believed by the employer and it was that belief and nothing else that caused him to fire the plaintiff.

There would be nothing pretextual about his action." (internal quotation marks omitted)).

The *Kariotis* court held that a plaintiff could potentially attack the investigatory process at the pretext stage, if "[the plaintiff] could point to facts suggesting that the company investigated her differently because [of her protected status]," but because she had not done so, she did not demonstrate pretext. *Kariotis,* 131 F.3d at 677. In this case, plaintiff claims that defendant investigated him differently because he is Indian, but he presents no evidence from which such an inference can be drawn. Perhaps the closest he can come is his assertion that Tsoukalas, who was purportedly overheard making race-related comments about plaintiff, convened the first committee to look into plaintiff's research and later made a formal allegation of misconduct to Dean Jamieson. However, this is nothing more than a cat's paw theory of liability – a suggestion that Tsoukalas's racial bias so infected the investigation process that his discriminatory animus should be imputed onto all of the various committee members and decisionmakers who were involved in the multi-level investigation that led to his eventual sanctions. This argument fails for the same reason his cat's paw argument failed, above: there is no evidence that Tsoukalas communicated his racial bias to anyone involved in the investigatory process, there is insufficient evidence to conclude that any or all of the layers of review were infected with any racial bias whatsoever, and the actions of Rutledge and Bertodano poke holes in plaintiff's claim that Tsoukalas – the only person for whom any evidence of bias exists – was the driving force behind the

investigation. In short, the record is severely lacking in evidence from which the court could find that an issue of fact exists as to whether plaintiff was investigated differently because of his race.

Plaintiff also alleges that his white collaborators did not receive similar sanctions. It is true that evidence that similarly-situated employees outside of a plaintiff's protected class received more favorable treatment from the same decisionmaker can help a plaintiff raise an inference of pretext. *Coleman,* 667 F.3d at 857. However, plaintiff does not point to similarly-situated employees who received more favorable treatment from the same decisionmaker. Rather, plaintiff points to employees of other universities. Such a comparison says nothing about the honesty of *defendant's* belief that plaintiff committed research fraud.

What is left is plaintiff's allegation regarding the failure of defendant to follow its own policies on issuing press releases. Specifically, plaintiff alleges that defendant issued a press release a month before he was sanctioned, and then at some point after he was sanctioned. However, defendant's purported error in publicizing plaintiff's research misconduct does not suggest that defendant is lying about its belief that plaintiff engaged in research misconduct. *Guinto v. Exelon Gen. Co.,* LLC, 341 F. App'x 240, 247 (7th Cir. 2009) (failure of employer to follow its own policies, without more, does not raise inference of discrimination). If anything, defendant's act of publicizing plaintiff's misconduct suggests that the relevant decisionmakers believed strongly

enough in the investigation's results to share them openly, despite the scrutiny and criticism the university would likely receive as a result.

Even when the court considers all of plaintiff's inadequate allegations and "evidence" together, it cannot find that plaintiff has demonstrated that defendant's given reasons for taking adverse employment actions against plaintiff – specifically, the fact that plaintiff had been found guilty of research misconduct by an investigative committee – was simply a lie it told to cover up its discriminatory animus. Accordingly, plaintiff's disparate treatment claim fails under the indirect method.

### 3.  Disparate Impact

As mentioned above, plaintiff's complaint and filings occasionally include the words "disparate impact." However, plaintiff fails to develop this claim in his filings, so the court considers it abandoned. *Palmer v. Marion County,* 327 F.3d 588, 597-98 (7th Cir. 2003) (failure to address claim in response to summary judgment motion is deemed abandoned). Even if the court considered the merits of such a claim, it would fail. To succeed on a disparate impact claim, a plaintiff bears the burden of showing that a particular employment practice causes a disparate impact on a protected class. *Adams v. City of Chicago,* 469 F.3d 609, 613 (7th Cir. 2006). To satisfy this burden, the plaintiff is "responsible for isolating and identifying the specific employment practices that are allegedly responsible for any observed statistical disparities." *Watson v. Fort Worth Bank & Trust,* 487 U.S. 977, 994 (1988); *Bennett v. Roberts,* 295 F.3d 687, 698 (7th Cir. 2002). "[I]t is not enough to simply allege that there is a disparate impact on workers, or point

to a generalized policy that leads to such an impact." *Smith v. City of Jackson,* 544 U.S. 228, 241 (2005). Identification of a specific practice is necessary to avoid employers being held liable for "the myriad of innocent causes that may lead to statistical imbalances." *Watson,* 487 U.S. at 994. The plaintiff must also establish causation by "offer[ing] statistical evidence of a kind and degree sufficient to show that the practice in question has caused the exclusion of applicants for jobs or promotions because of their membership in a protected group." *Id.* at 994–95.

In this case, plaintiff has not presented any statistical evidence suggesting that any practice of defendant's is causing the exclusion of Indians from any benefits, privileges, jobs, *etc.*, at Purdue. Plaintiff only tangentially approaches the topic of statistics at one point in his brief. In response to defendant's statement that plaintiff's case is unique, plaintiff states that defendant is essentially claiming that there can be no discrimination since there is nothing to compare it to. According to plaintiff, this is equivalent to dividing 1 by 0, which, is "effectively 'infinite.'" (DE # 102 at 19.) In other words, according to plaintiff "Defendant in effect has declared that it has 'infinitely' subjected Plaintiff to unprecedented acts of discrimination." (*Id.*) Plaintiff's argument is frivolous, has no place in a court of law, and need not be addressed further. It certainly does not establish disparate impact. What is left is plaintiff's repeated assertion that never in the history of defendant's institution has anyone ever been sanctioned as harshly as he was in this case. But without data as to how many Indians work for Purdue, how many have applied, how many have been investigated, how many have

been sanctioned, and so on, there is nothing from which the court can draw any reasonable inference in plaintiff's favor. Thus, defendant clearly deserves summary judgment on plaintiff's disparate impact claim.

### 4. Retaliation

Though plaintiff mentions "threats of retaliatory punishment" in his complaint (DE # 1 at 2), he does not meaningfully respond to defendant's motion for summary judgment on his retaliation claim. In fact, plaintiff's most notable reference to "retaliation" appears in his EEOC charge. On the EEOC charge, he marked an "X" in the box for "retaliation" (along with "race," "color," and "national origin"), as a ground forming the basis of his claim. (DE # 103-8 at 29.) He also stated:"I allege that I have been discriminated against due to my race, color national origin, and due to retaliation, in violation of Title VII." (*Id*.) The reference to retaliation in his EEOC charge is curious. Title VII's anti-retaliation provision protects employees from any adverse employment actions inflicted upon him because the employee engaged in a protected activity, such as filing an EEOC charge. 42 U.S.C. § 2000e-3(a). In other words, the protected activity must come first, and the adverse employment action must follow. Indeed, the adverse employment action must follow "on the heels" of the protected activity. *Mobley v. Allstate Ins. Co.*, 531 F.3d 539, 549 (7th Cir. 2008) (finding, as general rule, that adverse action must occur within days, or at most, weeks of protected activity). In this case, plaintiff's only conceivable protected activity was the filing of his EEOC charge, yet he complains of retaliation *in* his EEOC charge. All of this suggests that plaintiff may not

have fully understood what a retaliation claim was, when he placed an "X" in the box marked "retaliation" on the EEOC charge form. In any event, plaintiff has made no attempt to defend against defendant's attack on his retaliation claim, so the court considers any such "claim" to be abandoned. *Palmer,* 327 F.3d at 597-98. Even if the court considered the merits of a retaliation claim, it would fail because plaintiff has failed to identify any adverse employment action that occurred "on the heels" of the protected activity. *Mobley,* 531 F.3d at 549.

### 5. Harassment

Though neither party directly addressed any claim for hostile work environment or harassment in the pleadings or summary judgment briefing, plaintiff occasionally used the term "harassment" in his filings. Accordingly, though it does not appear that plaintiff intended to employ a harassment theory of recovery under Title VII, for the sake of completeness, the court notes that any such claim would fail. In order to establish a harassment or "hostile work environment" claim, "[t]he conduct at issue must have a racial character or purpose." *Luckie v. Ameritech Corp.,* 389 F.3d 708, 713 (7th Cir. 2004). The only racially-tinged actions in this case are Tsoukalas's alleged comments. However, these comments cannot form the basis of a Title VII claim because they were not timely presented to the EEOC, as explained earlier in this opinion. Further, those comments were overheard by plaintiff's colleagues, not plaintiff himself, and as such they do not suffice to establish a harassment claim. *Smith v. Ne. Illinois Univ.,* 388 F.3d 559, 567 (7th Cir. 2004) (no hostile work environment where employee

never personally heard co-worker utter racial epithet); *Luckie,* 389 F.3d at 714 (no hostile work environment where some actions were not even directed at plaintiff).

## IV. CONCLUSION

The court has been consciously aware of plaintiff's *pro se* status throughout this case, and has examined page after page of plaintiff's filings, which are voluminous, verbose, and at times difficult to understand. The court has given plaintiff every possible benefit of the doubt, analyzing every possible allegation and every piece of evidence under every conceivable rubric, taking all facts in a light most favorable to plaintiff. No matter how the evidence is rehashed, reorganized, or reexamined, the court must come to the same result: there is no genuine issue of material fact in this case as to whether defendant's decisions regarding plaintiff's employment had anything to do with the fact that plaintiff is Indian. Further, his tort claims are barred due to lack of proper notice.[9] This leaves plaintiff with no claims against defendant.

Plaintiff has requested that the court refrain from entering summary judgment against him until he can pursue additional discovery against defendant. Over three years passed between the start of this case and the close of discovery on June 28, 2013 (*see* DE # 76), and the discovery period was extended numerous times by Magistrate Judge Rodovich before it finally closed. Further, the discovery period was already closed when defendant moved for summary judgment. After the motion was filed,

---

[9] Because the court finds that defendant is entitled to summary judgment on the bases described above, the court need not address defendant's other arguments, such as *res judicata.*

Magistrate Judge Rodovich declined to reopen discovery for plaintiff. (DE # 112 at 7.) Plaintiff has given the court no reason to suggest that discovery should be reopened now. The request is denied.

For all of the reasons set forth above, defendant's motion for summary judgment (DE # 96) is **GRANTED** as to plaintiff's complaint in its entirety. As explained above, defendant's motion to strike (DE # 105) is **DENIED** as unnecessary. Because no claims remain against any parties in this case, the Clerk is now ordered to **ENTER FINAL JUDGMENT** in this case, stating:

> Judgment is entered in favor of defendant Purdue University, and against plaintiff Rusi P. Taleyarkhan, who shall take nothing by way of his complaint.

**SO ORDERED.**

Date: September 29, 2014

s/James T. Moody
JUDGE JAMES T. MOODY
UNITED STATES DISTRICT COURT